1   GARY L. REBACK (SBN 100118)
    greback@carrferrell.com
2   ROBERT J. YORIO (SBN 93178)
    Yorio@carrferrell.com
3   CARR & FERRELL *LLP*
    120 Constitution Drive
4   Menlo Park, California  94025
    Telephone:  (650) 812-3400
5   Facsimile:  (650) 812-3444
6
7   Attorneys for *Amicus Curiae*
    CONSUMER WATCHDOG
8
            IN THE UNITED STATES DISTRICT COURT
9
            NORTHERN DISTRICT OF CALIFORNIA
10
            SAN FRANCISCO DIVISION
11
12  UNITED STATES OF AMERICA,                CASE NO. CV 12-04177 SI
13                  Plaintiff,
                                             **MEMORANDUM OF POINTS AND**
14          v.                               **AUTHORITIES IN OPPOSITION TO THE**
                                             **ENTRY OF [PROPOSED] STIPULATED**
15                                           **ORDER FOR PERMANENT INJUNCTION**
                                             **AND CIVIL PENALTY JUDGMENT**
16  GOOGLE INC.,
17                  Defendant.
18
19
20
21
22
23
24
25
26
27
28

Memo of P&A in Opp to Entry of Proposed Stipulated Order
(Case No. CV-12-04177 SI)

## <u>TABLE OF CONTENTS</u>

I.  Statement of Facts ..................................................................................................... 1

    A.  Wi-Spy ............................................................................................................ 1

    B.  Google Buzz .................................................................................................... 5

    C.  Combining Personal Information .................................................................... 8

    D.  Safari Hacking ................................................................................................ 9

II.  The Proposed Order Fails to Meet the Relevant Legal Standards ................................ 12

    A.  The Relevant Standard of Review .................................................................. 16

    B.  The Proposed Order Fails to Include a Permanent Injunction ...................... 18

    C.  The Proposed Order Fails to Include a Sufficient Civil Penalty ................... 22

    D.  The Proposed Order Is Deficient in Including a Denial of Liability ............. 24

III. CONCLUSION ........................................................................................................... 24

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Binker v. Pennsylvania*
   977 F.2d 738 (3d Cir. 1992)...........................................................................13

*Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*
   386 U.S. 129 (1967)......................................................................................17

*FTC v. Circa Direct LLC*
   2012 U.S. Dist LEXIS 81878 (D.N.J. June 13, 2012) ......................12, 13, 14, 17, 18, 23, 24

*In the Matter of CVS Caremark Corporation*
   FTC File No. 112 3210 (May 15, 2012)
   http://www.ftc.gov/os/caselist/1123210/index.shtm...........................................12

*In the Matter of Google Inc.*
   FTC Docket No. C-4336 (Aug. 9, 2012) (Rosch, J.T. dissenting),
   http://www.ftc.gov/os/caselist/c4336/120809googleroschstatement.pdf .........5, 6, 10, 11, 16

*Johnson Prods. Co. v. F.T.C.*
   549 F.2d 35 (7th Cir. 1977) .........................................................................13

*S.E.C. v. Citigroup Global Markets, Inc.*
   673 F.3d 158 (2d Cir. 2012)..........................................................................14

*S.E.C. v. Lane*
   2009 U.S. Dist. LEXIS 7556 (M.D. Fla. July 10, 2009) ....................................14

*United States v. Chevron U.S.A.*, Inc.
   380 F. Supp. 2d, 1104 (N.D. Cal. 2003) .................................................14, 15

*United States v. Louisiana-Pacific Corp.*
   907 F.2d 1372 (9th Cir. 1992) .......................................................................13

*United States v. Microsoft Corp.*
   56 F.3d 1448 (D.C. Cir. 1995)..................................................................14, 15

*United States v. Oregon*
   913 F.2d 576 (9th Cir. 1990) ....................................................................13, 15

*United States v. SBC Commc'ns, Inc.*
   489 F. Supp. 2d 1 (D.D.C. 2007).....................................................................15

*United States v. Thomson Corp.*
   949 F. Supp. 909 (D.D.C. 1996).....................................................................23

1

**Statutes**

2    15 U.S.C. § 45(a) ................................................................................................13

3    15 U.S.C. § 45(l) ................................................................................9, 12, 21, 22

4    16 U.S.C. § 16(e) ................................................................................................14

5    **Legislative Reports**

6    H. R. Rep. No. 75-1613 at 4 (1938)....................................................................15

7    S. Rep. No. 75-221 at 2 (1937) ...........................................................................13

8

9    <u>**OTHER AUTHORITIES**</u>

10   **Government Statements and Correspondence**

11   Letter from Congress of the United States to The Honorable Jon Leibowitz, Chairman of the
12   Federal Trade Commission (Mar. 25, 2010),
     http://epic.org/privacy/ftc/googlebuzz/3_26_10_FTC_Letter_re_Google_Buzz.pdf .................6

13   Letter from David C. Vladeck, Office of the Director, Bureau of Consumer Protection, Federal
14   Trade Commission, to Albert Gidari, Attorney at Perkins Coie LLP (Oct. 27, 2010),
     www.ftc.gov/os/closingsg/staffclosing.shtm .......................................................................3

15   Letter from Ed Markey and Joe Barton, Members of the Committee on Energy and Commerce,
16   to The Honorable Jon Leibowitz, Chairman of the Federal Trade Commission (May 19, 2010),
     http://epic.org/privacy/ftc/google/5_19_10_Markey_Barton_FTC_re_Google_WiFi.pdf ..........2
17

18   Letter from Edward Markey and Joe Barton, Co-Chairmen Congressional Bi-Partisan Privacy
     Caucus, Congress of the United States, to Hon. John Leibowitz, Chairman of the Federal Trade
19   Commission. (Jan. 27, 2012)
     http://markey.house.gov/sites/markey.house.gov/files/documents/2012_0127%20Letter%20to%2
20   0FTC.pdf ..............................................................................................................8

21   Official Chat Transcript, Federal Trade Commission, *Google Q&A on Facebook Transcript*
22   (Aug. 9, 2012),
     http://www.ftc.gov/opa/socialmedia/facebookchats/120809googlefbchat.pdf.................7, 11, 22

23   Federal Communications Commission (F.C.C.), *Notice of Apparent Liability for Forfeiture*
24   (Apr. 13, 2012), http://transition.fcc.gov/DA-12-592A1.pdf .......................................4

25   Press Release, Federal Trade Commission, *FTC Charges Deceptive Privacy Practices in
     Google's Rollout of Its Buzz Social Network* (Mar. 30, 2011)
26   http://www.ftc.gov/opa/2011/03/google.shtm ..................................................6, 7

27   Press Statement, Federal Trade Commission, *Judge Orders Kevin Trudeau to Pay More Than
     $37 Million for False Claims About Weight-Loss Book* (Jan. 15, 2009),
28   http://www.ftc.gov/opa/2009/01/trudeau.shtm ....................................................22

The Federal Trade Commission, *Protecting Mobile Privacy* (May 10, 2011; p. 6) ....................7

Statement of the Commission (Aug. 9, 2012),
http://www.ftc.gov/os/caselist/c4336/120809googlestatement.pdf ...........................................10

[Proposed] Stipulated Order for Permanent Injunction and Civil Penalty Judgment at ¶ 2
(accessed Sept. 17, 2012), http://www.ftc.gov/os/caselist/c4336/120809googlestip.pdf..........11

**Articles and Blogs**

*Google hit with record fine*, BIG BROTHER WATCH (Aug. 9, 2012),
http://www.bigbrotherwatch.org.uk/home/2012/08/google-hit-record-fine.html#.UFTXE9kZ_4I
...............................................................................................................................................24

Alan Eustace, *Creating stronger privacy controls inside Google*, GOOGLE OFFICIAL BLOG
(Oct. 22, 2010), http://googleblog.blogspot.com/2010/10/creating-stronger-privacy-controls.html
.................................................................................................................................................3

Alan Eustace, *WiFi data collection: an update*, GOOGLE PUBLIC POLICY BLOG (May 14, 2010),
http://googlepublicpolicy.blogspot.com/2010/05/wifi-data-collection-update.html ...................2

Allison Grande, Law360, *FTC's $23M Google Fine Warns Cos. To Keep Privacy Promises*
(Aug. 9, 2012) http://www.law360.com/articles/368371.print?section=technology..................23

Claire Cain Miller and Tanzina Vega, *Google Introduces New Social Tool and Settles Privacy
Charge*, NEW YORK TIMES (Mar. 30, 2011)
http://www.nytimes.com/2011/03/31/technology/31ftc.html?pagewanted=all............................8

David Goldman, *Google fined $25,000 for 'willfully' stonewalling FCC*, CNN MONEY
(Apr. 16, 2012), http://money.cnn.com/2012/04/16/technology/google-fcc/index.htm...............4

David Streitfeld, *Data Harvesting at Google Not a Rogue Act, Report Finds*, NEW YORK TIMES
(Apr. 28, 2012), http://www.nytimes.com/2012/04/29/technology/google-engineer-told-others-
of-data-collection-fcc-report-reveals.html .................................................................................5

David Streitfeld and Edward Wyatt, *Unanswered Questions in F.C.C.'s Google Case*, NEW
YORK TIMES (Apr. 15, 2012), http://www.nytimes.com/2012/04/16/technology/fccs-google-case-
leaves-unanswered-questions.html?pagewanted=all ....................................................................5

Dina ElBoghdady, *FCC metes out light penalty for Google in Street View case*, WASHINGTON
POST (Apr. 16, 2010), http://www.washingtonpost.com/business/economy/fcc-metes-out-light-
penalty-for-google-in-street-view-case/2012/04/16/gIQAEryRMT_story.html .........................2

Grant Gross, *Google settles FTC complaint over Buzz*, PCWORLD (Mar. 31, 2011),
http://www.pcworld.com/article/223708/google_settles_ftc_complaint_over_buzz.html ..........7

Greg Sterling, *Cookiegate Another Privacy Black Eye For Google*, SEARCH ENGINE LAND (Feb. 17, 2012), http://searchengineland.com/cookiegate-another-privacy-black-eye-for-google-111993..........................................................................................................................24

Greg Sterling, *Identity of 'Wi-Spy' Google Engineer Revealed In Scandal That Won't Go Away*, MARKETING LAND (May 1, 2012), http://marketingland.com/identity-of-wi-spy-google-engineer-revealed-in-scandal-that-wont-go-away-10993 ..............................................................5

Hayley Tsukayama, *Google fined by FCC for impeding Street View probe*, WASHINGTON POST (Apr. 16, 2012), http://www.washingtonpost.com/business/technology/google-fined-by-fcc-for-impeding-street-view-probe/2012/04/16/gIQAePySLT_story.html ..............................................4

Ian Drury, *Google admits it STILL has the data its Street View cars stole (despite promising it had been deleted months ago)*, DAILY MAIL ONLINE (July 27, 2012), http://www.dailymail.co.uk/sciencetech/article-2179875/Google-admits-STILL-data-Street-View-cars-stole.html..............................................................................................................3

Jasmin Melvin, *Google pays $22.5 million to settle Apple Safari charges*, REUTERS (Aug. 9, 2012), http://www.reuters.com/article/2012/08/09/net-us-google-privacy-safari-idUSBRE8780VE20120809 ..........................................................................................21

Jonathan Mayer, *Setting the Record Straight on Google's Safari Tracking*, CIS STANFORD LAW SCHOOL (Feb. 21, 2012), http://cyberlaw.stanford.edu/blog/2012/02/setting-record-straight-google%E2%80%99s-safari-tracking ........................................................................24

Julia Angwin, *Google in New Privacy Probes*, WALL STREET JOURNAL (Mar. 16, 2012), http://online.wsj.com/article/SB10001424052702304692804577283821586827892.html .........9

Julia Angwin and Jennifer Valentino-Devries, *Google's iPhone Tracking*, WALL STREET JOURNAL (Feb. 17, 2012), http://online.wsj.com/article/SB10001424052970204880404577225380456599176.html .........9

Julia Angwin and Amir Efrati, *Google Settles With FTC Over Google Buzz*, WALL STREET JOURNAL (Mar. 30, 2011), http://online.wsj.com/article/SB10001424052748703806304576232600483636490.html .....6, 7

Kevin Hunt, *FTC Drops $22.5 Million Fine On Google, But Is It Really Apple's Fault?*, HARTFORD COURANT (Aug. 9, 2012), http://courantblogs.com/bottom-line/ftc-drops-22-5-million-fine-on-google-but-is-it-really-apples-fault/ ................................................................24

Peter Fleischer, *Data Collected By Google Cars*, GOOGLE EUROPE BLOG (Apr. 27, 2010), http://googlepolicyeurope.blogspot.com/2010/04/data-collected-by-google-cars.html ..............2

Sara Forden and Brian Womack, *Google Settles Data Privacy Complaint With FTC on 'Buzz' Social Network*, BLOOMBERG (Mar. 30, 2011), http://www.bloomberg.com/news/2011-03-30/google-settles-privacy-complaint-on-buzz-with-ftc-advocacy-group-says.html....................6

Thomas Catan, *Con Artist Starred in Sting That Cost Google Millions*, WALL STREET JOURNAL (Jan. 25, 2012), http://online.wsj.com/article/SB10001424052970204624204577176964003660658.html .......22

Thomas Claburn, *Google's Privacy Invasion:  It's Your Fault*, INFORMATIONWEEK (Aug. 9, 2012), http://www.informationweek.com/security/privacy/googles-privacy-invasion-its-your-fault/232601119 ....................................................................................................24

Tony Romm and Elizabeth Wasserman, *FTC pick ripped Google probe*, POLITICO (Sept. 11, 2012), http://www.politico.com/news/stories/0912/81034.html ...............................21

Tony Romm, *FTC steps on Google's Buzz*, POLITICO (Mar. 30, 2011), http://www.politico.com/news/stories/0311/52214.html.............................................................8

Wendy Davis, *Google Agrees To $22.5 Mil Fine For Tracking Safari Users*, ONLINE MEDIA DAILY (Aug. 9, 2012), http://www.mediapost.com/publications/article/180552/ .....................10

At issue in this case is whether this Court will lend its imprimatur to a settlement proposal so markedly deficient that it fails to meet the relevant legal standards of "adequacy" and furthering "the public interest." The proposed settlement fails on three distinct grounds. First, under case law, as the FTC has conceded, the proposed settlement must be measured against the complaint to assess its adequacy. The complaint in this case prays for a permanent injunction and the form of the proposed order clearly contemplates that relief, but no permanent injunction is included in the order. Second, even the Commission admits that the size of the civil penalty in the proposed order "can be dismissed as inadequate." And, finally, the Commission has taken the rare if not extraordinary step of permitting Google to deny liability expressly in the proposed order. The settlement proposal therefore fails factually and logically to further either the Commission's stated rationale for the remedy or the Congressional intent behind the statute under which the FTC seeks to proceed, and, accordingly, this Court should reject it.

## I.  Statement of Facts

### A.  Wi-Spy

The FTC's halfhearted and ineffectual attempts to make Google respect the privacy of Internet users began more than two years ago with the so-called Wi-Spy scandal. As part of the "Street View" feature of its mapping service, Google deployed fleets of cars around the world outfitted with cameras to collect photographs of street scenes, including private homes. The equipment and cars also collected information regarding WiFi access points, allegedly (according to Google) to improve Google's location services – so that applications and devices could identify the user's location and provide directions.

The launch of Street View precipitated questions and concerns from consumer protection groups and data protection authorities, particularly in Europe. According to the *Washington Post*, in early 2010 "German authorities asserted that Google's cars were collecting personal Internet content as they drove past houses with WiFi networks that were not password-

protected."[1]  On April 27, 2010, Google posted a blog entry responding to "concerns raised by data protection authorities in Germany."[2]  "Google does not collect or store payload data," the posting stated unequivocally.  ("Payload" data refers to the actual text, passwords, addresses and the like of email messages transmitted by WiFi access points, as opposed to information that merely identifies the WiFi network and how that network operates.)

Apparently unmollified, the German Data Protection Authority (DPA) demanded an audit of the WiFi data Google Street View cars had collected.[3]  On May 14, 2010, a Google senior vice-president posted a blog entry stating that the audit had revealed discrepancies with respect to Google's prior statements.  In fact, stated the new blog posting, Google had been collecting "samples" of payload data from private WiFi networks for more than two years.  The company went on to imply that the data collected was minimal ("we will typically have collected only fragments of payload data"), that the collection occurred by "mistake" through the conduct of a rogue engineer, and that the engineer's supervisors and colleagues "did not want, and had no intention of using, payload data."  The posting promised that Google would review its "procedures to ensure that our controls are sufficiently robust to address these kinds of problems . . . ."

The press reported reactions ranging from concern to outrage from consumer protection groups and data protection authorities.  Two important members of Congress, co-chairmen of the Congressional Bi-Partisan Privacy Caucus, jointly wrote a letter to the chairman of the Federal Trade Commission requesting an investigation.[4]  "[D]oes the Commission believe it currently

---

[1] Dina ElBoghdady, *FCC metes out light penalty for Google in Street View case*, WASHINGTON POST (Apr. 16, 2010), http://www.washingtonpost.com/business/economy/fcc-metes-out-light-penalty-for-google-in-street-view-case/2012/04/16/gIQAEryRMT_story.html.

[2] Peter Fleischer, *Data Collected By Google Cars*, GOOGLE EUROPE BLOG (Apr. 27, 2010), http://googlepolicyeurope.blogspot.com/2010/04/data-collected-by-google-cars.html.

[3] *See* Alan Eustace, *WiFi data collection: an update*, GOOGLE PUBLIC POLICY BLOG (May 14, 2010), http://googlepublicpolicy.blogspot.com/2010/05/wifi-data-collection-update.html.

[4] Letter from Ed Markey and Joe Barton, Members of the *Committee on Energy and Commerce*, to The Honorable Jon Leibowitz, Chairman of the *Federal Trade Commission* (May 19, 2010), http://epic.org/privacy/ftc/google/5_19_10_Markey_Barton_FTC_re_Google_WiFi.pdf.

has authority to take necessary action?" the letter asked.  "If not, please describe legislative language you would recommend to enable the Commission to act appropriately."

On October 22, 2010, Google made yet another posting on the Wi-Spy scandal, this time explaining that the key denial of the previous May 14, 2010 posting had been erroneous. According to the new posting, examination of the captured data by "external regulators" revealed that "entire emails and URLs were captured, as well as passwords."  The posting also announced changes to internal processes within Google, including the appointment of a director of privacy for engineering and product management, privacy training for key employees, and incorporation of a privacy review process into the design phases of new initiatives.[5]

Only a few days later, the FTC's Director of the Bureau of Consumer Protection wrote Google's counsel a letter.[6]  The letter recited the three internal changes published by Google, referred to Google's stated intention to delete the collected payload data,[7] and stated that Google had assured the FTC that the company would not make use of the collected payload data. "Because of these commitments," the letter concluded, "we are ending our inquiry into this matter at this time."  No formal investigation was undertaken; no charges (either in the FTC or in the courts) were filed; no order to regulate future conduct was entered; no fines were assessed.

---

[5] Alan Eustace, *Creating stronger privacy controls inside Google*, GOOGLE OFFICIAL BLOG (Oct. 22, 2010), http://googleblog.blogspot.com/2010/10/creating-stronger-privacy-controls.html.

[6] Letter from David C. Vladeck, Office of the Director, Bureau of Consumer Protection, *Federal Trade Commission*, to Albert Gidari, Attorney at *Perkins Coie LLP* (Oct. 27, 2010), www.ftc.gov/os/closingsg/staffclosing.shtm.

[7] Google made representations that it would destroy the captured data to governmental authorities in the UK, but promptly breached those undertakings.  *See* Ian Drury, *Google admits it STILL has the data its Street View cars stole (despite promising it had been deleted months ago)*, DAILY MAIL ONLINE (July 27, 2012), http://www.dailymail.co.uk/sciencetech/article-2179875/Google-admits-STILL-data-Street-View-cars-stole.html.

1    With the lights off at the Federal Trade Commission, the Federal Communications

2    Commission opened its own investigation of the Street View project.[8]  Seventeen months later,

3    the FCC published a heavily-redacted report, finding that Google "deliberately impeded and

4    delayed" the FCC investigation by failing to respond to information requests.  "Google

5    apparently willfully and repeatedly violated Commission orders to produce certain information

6    and documents that the Commission required for its investigation," it added.[9]  The Commission

7    fined Google $25,000 for its conduct, the maximum possible by law.  But the FCC closed its

8    investigation without charging Google with violating federal law because the Google engineer in

9    charge of the project refused to talk to federal investigators, so the FCC could not make

10    necessary factual determinations.[10]

11    Google treated the FCC report as an exoneration.  "As the FCC notes in their report, we

12    provided all the materials the regulators felt they needed to conclude their investigation and we

13    were not found to have violated any laws," said a Google spokeswoman.[11]  When the press

14    subsequently secured a less redacted version of the report from Google, the document showed,

15    contrary to Google's repeated representations, that the capture of payload information was

16    intentional and that several people at Google, including a senior manager, were aware of that

17

18

19

20    [8] *See* David Streitfeld and Edward Wyatt, *Unanswered Questions in F.C.C.'s Google Case*, NEW
21    YORK TIMES (Apr. 15, 2012), http://www.nytimes.com/2012/04/16/technology/fccs-google-case-
     leaves-unanswered-questions.html?pagewanted=all.

22    [9] David Goldman, *Google fined $25,000 for 'willfully' stonewalling FCC*, CNN MONEY (April
23    16, 2012), http://money.cnn.com/2012/04/16/technology/google-fcc/index.htm; Federal
     Communications Commission (F.C.C.), Notice of Apparent Liability for Forfeiture (Apr. 13,
24    2012), http://transition.fcc.gov/DA-12-592A1.pdf.

25    [10] *See* David Streitfeld and Edward Wyatt, *Unanswered Questions in F.C.C.'s Google Case*,
     NEW YORK TIMES (Apr. 15, 2012), http://www.nytimes.com/2012/04/16/technology/fccs-google-
26    case-leaves-unanswered-questions.html?pagewanted=all.

27    [11] Hayley Tsukayama, *Google fined by FCC for impeding Street View probe*, WASHINGTON POST
     (Apr. 16, 2012), http://www.washingtonpost.com/business/technology/google-fined-by-fcc-for-
28    impeding-street-view-probe/2012/04/16/gIQAePySLT_story.html.

Memo of P&A in Opp to Entry of Proposed Stipulated Order                                    4
(Case No. CV-12-04177 SI)

fact.[12]  According to the *New York Times*, "[t]he data proved to be a snapshot of what people were doing at the moment the cars rolled by – e-mailing a lover, texting jokes to a buddy, balancing a checkbook, looking up an ailment."[13]  Nevertheless, the lights remained off in the federal government.

**B.  Google Buzz**

On February 9, 2010, Google launched a social networking service called Google Buzz, in an apparent attempt to compete with Facebook.  But Google Buzz had no users, so Google decided to kick start its social networking service by taking personal information provided by registered users of Google's popular online email service, Gmail, including first and last names and email contacts, and publicly integrating that information into Buzz without permission.

Google's written privacy policy at the time promised that the company would obtain user consent before using information "in a manner different from the purpose for which it was collected."[14]  Nevertheless, registered Gmail users awoke the morning of February 9 to find that Buzz had automatically created public circles of "friends" for Gmail users based on their most frequent email contacts.  In other words, Google publicly disclosed without permission not only the users' contact lists, but also the contacts with whom users communicated the most – including abusive ex-husbands, clients of mental health professionals, clients of attorneys, children, and employment recruiters with whom users had confidentially emailed regarding job placement.[15]

---

[12] *See* David Streitfeld, *Data Harvesting at Google Not a Rogue Act, Report Finds*, NEW YORK TIMES (Apr. 28, 2012), http://www.nytimes.com/2012/04/29/technology/google-engineer-told-others-of-data-collection-fcc-report-reveals.html; Greg Sterling, *Identity of 'Wi-Spy' Google Engineer Revealed In Scandal That Won't Go Away*, MARKETING LAND (May 1, 2012), http://marketingland.com/identity-of-wi-spy-google-engineer-revealed-in-scandal-that-wont-go-away-10993.

[13] *See* David Streitfeld and Edward Wyatt, *Unanswered Questions in F.C.C.'s Google Case*, NEW YORK TIMES (Apr. 15, 2012), http://www.nytimes.com/2012/04/16/technology/fccs-google-case-leaves-unanswered-questions.html?pagewanted=all.

[14] Complaint at ¶ 6, In the Matter of Google Inc., FTC Docket No. C-4336 (Oct. 13, 2011) (the "Buzz Complaint").

[15] Buzz Complaint at ¶ 11.

Irate users swamped Google with complaints and outraged commentators pilloried Google in the press.[16]  Eleven members of Congress wrote a letter to the chairman of the FTC asking for a careful investigation to "determine whether Google failed to adequately protect consumers' privacy rights."[17]  Over the next few days, Google made some tweaks to Buzz in order to respond to criticism.[18]  More tellingly, Google dropped the promise from its privacy policy that it would obtain consent before using consumer information in a manner different from the purpose for which it was collected.[19]

The public condemnation triggered only a settlement negotiation between the FTC and Google.  On March 30, 2011, the FTC simultaneously published an internal (administrative) FTC complaint against Google and a draft agreement settling the complaint by consent.[20]  The consent agreement contained no fine, but it did contain a provision making it clear that Google did not admit the truth of the facts alleged or that the law had been violated.  The consent agreement restored Google's prior policy of getting permission before using consumer information in a manner different from the purpose for which it was collected – but only in part.  With the FTC's okeydoke, Google bound itself only to get permission if consumer data was to be shared outside

---

[16] Press Release, Federal Trade Commission, FTC Charges Deceptive Privacy Practices in Google's Rollout of Its Buzz Social Network (Mar. 30, 2011) http://www.ftc.gov/opa/2011/03/google.shtm.

[17] Letter from *Congress of the United States* to The Honorable Jon Leibowitz, Chairman of the *Federal Trade Commission* (Mar. 25, 2010), http://epic.org/privacy/ftc/googlebuzz/3_26_10_FTC_Letter_re_Google_Buzz.pdf.

[18] *See* Sara Forden and Brian Womack, *Google Settles Data Privacy Complaint With FTC on 'Buzz' Social Network*, BLOOMBERG (Mar. 30, 2011), http://www.bloomberg.com/news/2011-03-30/google-settles-privacy-complaint-on-buzz-with-ftc-advocacy-group-says.html.

[19] Julia Angwin and Amir Efrati, *Google Settles With FTC Over Google Buzz*, WALL STREET JOURNAL (Mar. 30, 2011), http://online.wsj.com/article/SB10001424052748703806304576232600483636490.html.

[20] Agreement Containing Consent Order, In the Matter of Google Inc., FTC Docket No. C-4336 (May 30, 2011).

1   the company, but not if it was shared inside Google, even for a different purpose.[21]   In addition,

2   the settlement agreement barred Google from certain future privacy misrepresentations, required

3   Google to implement what the FTC called a "comprehensive privacy program," and mandated

4   regular, independent privacy audits.[22]

5          With grand claims and sweeping promises, the FTC ballyhooed its settlement to the press

6   and to the public – issuing a press release, publishing a blog, contacting reporters, and even

7   conducting a public "chat" over Twitter.  "This is a tough settlement that ensures that Google

8   will honor its commitments to consumers and build strong privacy protections into all of its

9   operations," stated the FTC Chairman in a press release.[23]   Google's conduct would subsequently

10  prove the statement incorrect.

11         The FTC touted in particular the "comprehensive privacy program" requirement of the

12  settlement as providing "significant protections" for Google users.[24]   The FTC claimed time and

13  again that "the settlement marked the first time a company had agreed to implement a wide-

14  ranging privacy program that will cover future as well as current products."[25]   No mention was

15  made of the fact that elements of the "comprehensive" program, as listed in the settlement,

16  largely overlapped the changes to its internal processes Google announced in October 2010,

17

18  [21]   *See* Julia Angwin and Amir Efrati, *Google Settles With FTC Over Google Buzz*, WALL
    STREET JOURNAL (Mar. 30, 2011),
19  http://online.wsj.com/article/SB10001424052748703806304576232600483636490.html.

20  The FTC may not have understood what it was giving away to Google, as its representatives
    subsequently and incorrectly told a Senate subcommittee that the settlement required Google to
21  get permission for any change that makes consumer information more widely available. Prepared
    Statement, The Federal Trade Commission, Protecting Mobile Privacy (May 10, 2011; p. 6).
22
    [22]  Press Release, Federal Trade Commission, FTC Charges Deceptive Privacy Practices in
23  Google's Rollout of Its Buzz Social Network (Mar. 30, 2011),
    http://www.ftc.gov/opa/2011/03/google.shtm.
24
    [23]  *Id.*
25
    [24]  Grant Gross, *Google settles FTC complaint over Buzz*, PCWORLD (Mar. 31, 2011),
26  http://www.pcworld.com/article/223708/google_settles_ftc_complaint_over_buzz.html.

27  [25]  *See* Julia Angwin and Amir Efrati, *Google Settles With FTC Over Google Buzz*, WALL STREET
    JOURNAL (Mar. 30, 2011),
28  http://online.wsj.com/article/SB10001424052748703806304576232600483636490.html.

Memo of P&A in Opp to Entry of Proposed Stipulated Order          7
(Case No. CV-12-04177 SI)

1   based upon which the FTC closed its ongoing investigation into the Wi-Spy scandal.  An FTC

2   spokesman did point out that the Buzz agreement provisions would have covered (and

3   presumably proscribed) Google's Wi-Spy conduct.[26]  But, of course, no FTC order was in effect

4   at the time of the Wi-Spy incident, and none was adopted as a result of it.

5         Google, for its part, apologized for the Buzz incident, but according to the *New York*

6   *Times*, "said the rules mandated by the F.T.C. would not change the way it operated."[27]  After a

7   period of public comment, the FTC formally adopted the settlement in October 2011.

8   **C. Combining Personal Information**

9         On January 24, 2012, likely before the ink was even dry on the Commissioners'

10   signatures, Google announced, effective March 1, 2012, that it would implement changes to its

11   user policies for all of its services.  Specifically, under the new policies, Google would "combine

12   personal information from one service with information, including personal information from

13   other services" without obtaining user permission.[28]  This allowed Google to track the users of its

14   activities across all of its services, including search – meaning that, for example, Google would

15   combine confidential user information provided for Gmail with other Google services like social

16   networking.  At a minimum, this would appear to violate the privacy policy Google had in place

17   from October 2004 through October 2010 – that Google would obtain permission before using

18   information "in a manner different from the purpose for which it was collected."

19

20

21   [26] Tony Romm, *FTC steps on Google's Buzz*, POLITICO (Mar. 30, 2011),
     http://www.politico.com/news/stories/0311/52214.html.

22   [27] Claire Cain Miller and Tanzina Vega, *Google Introduces New Social Tool and Settles Privacy*
23   *Charge*, NEW YORK TIMES (Mar. 30, 2011),
     http://www.nytimes.com/2011/03/31/technology/31ftc.html?pagewanted=all. The *Times* also
24   quoted a Google spokesperson as saying, "We don't see this as being a significant change in how
     we run our business because this is the standard we hold ourselves to already."

25   [28] *See* Letter from Edward Markey and Joe Barton, Co-Chairmen Congressional Bi-Partisan
26   Privacy Caucus, *Congress of the United States*, to Hon. John Leibowitz, Chairman of the *Federal*
     *Trade Commission*. (Jan. 27, 2012; retrieved Sept. 17, 2012),
27   http://markey.house.gov/sites/markey.house.gov/files/documents/2012_0127%20Letter%20to%2
28   0FTC.pdf.

Howls of outrage arose from many quarters.  Numerous countries opened investigations into Google's changes, many of which remain open today.  The co-chairman of the Congressional Bi-Partisan Privacy Caucus again wrote the chairman of the FTC, this time asking whether the new policy changes violated the Buzz consent decree.  *See supra* note 28.  But the FTC took no action, presumably because the consent decree it had entered in the Buzz matter blessed, wittingly or otherwise, Google's new conduct by only proscribing sharing with third parties without permission.

**D.  Safari Hacking**

On February 17, 2012, the *Wall Street Journal* published a story alleging that Google had been using "special code" that "tricks" Apple's Safari web-browsing software, permitting Google to track "the Web-browsing habits of people who intended for that kind of monitoring to be blocked."[29]  Google's conduct "appeared to contradict some of [the company's] own instructions to Safari users on how to avoid tracking," the *Journal* stated.  The *Journal* subsequently reported an FTC investigation into "whether Google's actions violated [the preceding year's] Buzz settlement" in which Google pledged not to 'misrepresent' its privacy practices to consumers . . . ."[30]

There followed, yet again, negotiation and settlement. On August 8, 2012, the FTC (represented by the Department of Justice) filed a complaint in this Court under Section 5(l) of the FTC Act (15 U.S.C. §45(l)), alleging, *inter alia*, that Google's conduct in bypassing Safari's privacy settings violated the Buzz settlement, specifically the prohibition against misrepresenting "in any manner . . . the extent to which consumers may exercise control over the collection, use,

---

[29] Julia Angwin and Jennifer Valentino-Devries, *Google's iPhone Tracking*, WALL STREET JOURNAL (Feb. 17, 2012), http://online.wsj.com/article/SB10001424052970204880404577225380456599176.html.

[30] Julia Angwin, *Google in New Privacy Probes*, WALL STREET JOURNAL (Mar. 16, 2012), http://online.wsj.com/article/SB10001424052702304692804577283821586827892.html.

1   or disclosure" of various types of user identifying information, including web-browsing

2   activity.[31]

3       Simultaneously with the filing of the complaint, the Commission (through the Justice

4   Department) filed a "[Proposed] Stipulated Order for Permanent Injunction and Civil Penalty

5   Judgment," the terms of which had already been negotiated with and agreed to by Google.  The

6   proposed order provided only for a civil penalty of $22.5 million under § 5(l) of the FTC Act and

7   a requirement that Google maintain through February 15, 2012, systems to "expire" the

8   "cookies" (tiny tracking files) it had placed.

9       The proposed settlement is markedly unusual and deficient in three important respects.

10   First, the proposed order contains no injunction to deter and prevent Google from additional

11   violations of the Buzz decree, notwithstanding the fact that the Safari Complaint (filed

12   simultaneously) prays specifically for that injunctive relief and the proposed order's caption and

13   text clearly contemplate it.  Second, the pre-negotiated civil penalty is such a small percentage of

14   Google's profits and revenues (a *de minimis* percentage according to Commissioner Rosch) that

15   even the Commission majority concedes that it "can be dismissed as insufficient."[32]  Indeed, the

16   size of the penalty in relation to the size of the defendant pales in comparison to other fines

17   imposed by the Commission.  Finally, going well beyond the provision in the Buzz consent order

---

18   [31] Complaint at ¶¶ 6-10, United States of America v. Google, Inc., Case No. 12-cv-04177 (N.D.
19   Cal. Aug. 8, 2012) (the "Safari Complaint").  The technical details of Google's conduct are a bit
20   complicated.  Basically, Google told Safari users that they did not need to take any action to be
     opted out of Google's targeted advertising.  Safari Complaint at ¶ 36.  But, despite these
21   representations, when a Safari user with the default browser setting to block third party
     "cookies" (tiny tracking files) visited a Google web site or even a web site that used Google's
22   advertising services, Google set an initial cookie on the user's browser, and thereafter additional
     cookies, that enabled Google to collect information about and serve targeted advertisements to
23   users who did not want either the tracking or the targeted ads. Safari Complaint at ¶¶ 42, 44, 46
     and 48.  In other words, despite its representation to Safari users, Google overrode the Safari
24   default browser setting and placed advertising cookies on Safari browsers. Safari Complaint at ¶
     41.  Apparently, Google set the initial cookie in order to enable social networking features to
25   facilitate its competition with Facebook.  *See* Wendy Davis, *Google Agrees To $2.5 Mil Fine
     For Tracking Safari Users*, ONLINE MEDIA DAILY (Aug. 9, 2012),
26   http://www.mediapost.com/publications/article/180552/.

27   [32] Statement of the Commission (Aug. 9, 2012),
     http://www.ftc.gov/os/caselist/c4336/120809googlestatement.pdf.
28

Memo of P&A in Opp to Entry of Proposed Stipulated Order                    10
(Case No. CV-12-04177 SI)

1    pursuant to which Google refused to admit either the alleged facts or the claimed legal violations,

2    the proposed Safari order contains (with the Commission's permission and approval) an express

3    denial by Google of "any and all liability for the claims set forth in the Complaint, and all

4    material allegations of the Complaint, save for those regarding jurisdiction and venue."[33]

5         Commissioner Rosch dissented from the Commission decision approving the decree

6    "because it arguably cannot be concluded that the consent decree is in the public interest when it

7    contains a denial of liability."[34]   Commentators and analysts excoriated the Commission's

8    proposed remedy as inadequate.  Yet the Commission's staff, as before, immediately took to the

9    airwaves, issuing a press release, initiating a telephonic press conference with reporters, and

10   conducting "chats" on Twitter and Facebook, all for the purpose of "selling" the notion that the

11   Commission's most recent agreement with Google protected the public.

12        In response to withering criticism of inadequacy from the public, the Commission and its

13   staff offered several justifications for its approach that we recount and analyze below.  But they

14   are all varieties of the same basic theme.  "This is a settlement," said the Commission majority in

15   its formal statement endorsing the agreement, "and, in our view, the most important question is

16   whether Google will abide by the underlying FTC [Buzz] consent order going forward."

17   STATEMENT OF THE COMISSION, *supra* note 31, at 1-2.

18        On this "most important question," we join issue.  Given Google's history of failing to

19   either respect the privacy of its users or even to comply with its prior privacy undertakings, and,

20   given the Commission's repeatedly ineffectual attempts to secure compliance, what facts and

21   what plausible reasoning based on those facts justify the Commission's decision, even under a

22   deferential judicial standard?

23        The record now before this Court fails to provide any basis on which the Court might

24   evaluate the Commission's rationale, much less defer to it.  And, given the glaring deficiencies –

25

26   [33] [Proposed] Stipulated Order for Permanent Injunction and Civil Penalty Judgment at ¶ 2
     (accessed Sept. 17, 2012), http://www.ftc.gov/os/caselist/c4336/120809googlestip.pdf.

27   [34] In the Matter of Google Inc., FTC Docket No. C-4336 (Aug. 9, 2012) (Rosch, J.T. dissenting),
     http://www.ftc.gov/os/caselist/c4336/120809googleroschstatement.pdf.

28

1    deficiencies that squarely undermine the Commission's stated rationale – we submit that the

2    Commission cannot make the requisite showing under the appropriate legal standard to justify

3    entry of the proposed order.

**II. The Proposed Order Fails to Meet the Relevant Legal Standards.**

4

5        The FTC has chosen[35] to challenge Google's latest privacy transgression by filing

6    (through the Department of Justice) a complaint in federal district court alleging a violation of §

7    5(l) of the FTC Act (15 U.S.C. § 45(l)) – basically, an action for violation of the earlier Buzz

8    order.  This suit was settled in advance of filing, and a proposed order resolving this matter was

9    submitted by the parties to this Court contemporaneously with the Complaint.  To obtain the

10   relief agreed to by Google in the proposed order, the government must obtain approval of the

11   settlement by this Court.

12   **A.  The Relevant Standard of Review**

13       The Commission conceded in briefing only a few months ago (before a different court)

14   that a court must determine in a case like this whether a proposed settlement is "fair, adequate,

15   reasonable, and in the public interest."[36]  We agree that this is the appropriate legal standard of

16

17

18

19

20

21

22

_____

23   [35] The FTC had alternatives.  Parties have agreed to pay money to the FTC in exchange for the
24   Commission's agreement to settle a complaint without the necessity of actually going to court.
     A recent example is the CVS Caremark case.  In the Matter of CVS Caremark Corporation, FTC
25   File No. 112 3210 (May 15, 2012), http://www.ftc.gov/os/caselist/1123210/index.shtm.

26   [36] *See* Plaintiff FTC's Submission Supporting Entry of Proposed Stipulated Final Judgment and
     Order, FTC v. Circa Direct, LLC, Case No. 11-cv-2172 RMB-AMD (D.N.J. Mar. 14, 2012) (the
27   "March 14, 2012 FTC Submission").  A copy of the March 14, 2012 FTC Submission is attached
     hereto as Exhibit "A." FTC v. Circa Direct LLC, 2012 U.S. Dist. LEXIS 81878, at *5 (D.N.J.
28   June 13, 2012).

review, and in the interest of remaining within our page limitations, we do not brief this issue in any detail.[37]

According to a couple of cases in other circuits, the "fair, adequate and reasonable" standard permits the Court to consider factors such as the strength and weakness of each side's case, the defendant's financial resources and the amount of damages actually recovered.[38]  A court in this district has explained the standard somewhat differently, indicating that courts are to examine procedural as well as substantive fairness to determine, among other things, whether the government has relied too heavily on the defendant in crafting the settlement and whether the decree represents "a reasonable factual and legal determination."  *United States v. Chevron U.S.A., Inc.*, 380 F. Supp. 2d 1104, 1111 (N.D. Cal. 2003).

Few courts have had occasion to consider what the "public interest" standard entails outside a specific regulatory framework that governs the review of agency settlements.  Plainly, the district court in *Circa Direct* considers the "public interest" prong of the standard to be broader than the other three requirements.  Hence, in that court's view, a court may consider the

---

[37] The "fairness, adequacy and reasonableness" requirements are a "universal" standard to be applied even in the absence of a particular regulatory framework that guides the review of settlements by government agencies.  *See* Binker v. Pennsylvania, 977 F.2d 738, 747-48 (3d Cir. 1992); United States v. Oregon, 913 F.2d 576, 580 (9th Cir. 1990).  As the FTC has correctly pointed out in the Circa Direct case, the "public interest" requirement applies when a settlement results from a government enforcement action, March 14, 2012 FTC Submission at 4, and, as the court in Circa Direct added, it applies because of the important public interest at stake and the fact that the Court is placing its imprimatur behind the decree.  Circa Direct, 2012 U.S. Dist. LEXIS 81878, at *5 (June 13, 2012).

Circa Direct involves the settlement of a lawsuit filed under § 13(b) of the FTC Act for a violation of § 5 of the FTC Act, 15 U.S.C. § 45(a).  The government brings this case under § 5(l) of the FTC Act, which was expressly amended in 1938 to give the FTC the responsibility to protect the public interest ("Congress intended to make clear that the FTC . . . had jurisdiction to protect the public interest at large," S. Rep. No. 75-221 at 2 (1937)), thus indicating even more strongly the need to satisfy the "public interest" requirement.  Moreover, as the Seventh Circuit observed decades ago, the Commission, "unlike a private litigant, must act in furtherance of the public interest."  Johnson Prods. Co. v. F.T.C., 549 F.2d 35, 38 (7th Cir. 1977).

[38] Circa Direct, 2012 U.S. Dist. LEXIS 81878, at *4 (June 13, 2012). In cases where the government has proven a violation of a consent decree, courts can also look to harm to the public, deterrence of future violations, and vindication of the FTC's authority, among other factors.  *See, e.g.,* United States v. Louisiana-Pacific Corp., 907 F.2d 1372, 1379-80 (9th Cir. 1992).

---

absence of an admission of liability, the public interest in knowing the truth about a matter of public importance, and other matters the court deems appropriate.[39]

The decisions construing the public interest requirement, and, for that matter, the other elements of the legal standard in this type of case, indicate three broad areas of consensus. First, a court should not "accept conclusory arguments regarding the public interest" or "rubberstamp all arguments" made by the FTC (or any other agency).[40] Instead, the court must conduct its own independent evaluation of the agency's facts and reasoning to determine whether the legal standard is satisfied.[41]

This means, second, that the FTC must provide this Court with its reasoning and the facts supporting that reasoning. *See Circa Direct*, 2012 U.S. Dist. LEXIS 81878, at *6 (June 13, 2012). Again, even the ultra-deferential Tunney Act cases impose this obligation on the

---

[39] *See* Circa Direct, 2012 U.S. Dist. LEXIS 81878, at *6 (June 13, 2012). The FTC cited the Microsoft consent decree (United States v. Microsoft Corp., 56 F.3d 1448 (D.C. Cir. 1995) to the Circa Direct court in support of a very constricted view of the public interest requirement (and a very broad requirement of judicial deference). Circa Direct, 2012 U.S. Dist. LEXIS 81878, at *5 (June 13, 2012). But the Circa Direct court reasoned that the Microsoft interpretation of the appropriate standard of review was based on a specific statute, the Tunney Act, and, hence, of "unclear" applicability. The Tunney Act applies to settlements involving the Justice Department. In a politically charged and heavily criticized decision, the D.C. Circuit severely limited the power of district court judges in that circuit to apply the Act. In any event, the Tunney Act has its own legislative history and judicial interpretation based on that legislative history, as the Circa Direct court pointed out. More importantly, the enumerated public interest factors in the Tunney Act involve specific market-type analyses that courts are far less qualified to make than antitrust enforcement agencies (e.g., "the competitive impact of the judgment," and "other competitive considerations," *see* 16 U.S.C. § 16(e)), and, hence, the need for greater judicial deference.

An emergency panel (but not a merits panel) of the Second Circuit has suggested that the authority used by one of its district courts to deny the entry of a consent judgment stands only for the proposition that if a court enters an injunction, it must ensure that the injunction does not cause harm to the public interest. *See* S.E.C. v. Citigroup Global Markets, Inc., 673 F.3d 158, n.1 (2d Cir. 2012). The Second Circuit's dicta is inapplicable here; that court did not hold that the public interest requirement is always limited to avoiding harm to the public.

[40] *See* Circa Direct, 2012 U.S. Dist. LEXIS 81878, at *6 (June 13, 2012); S.E.C. v. Lane, 2009 U.S. Dist. LEXIS 7556 at *4 (M.D. Fla. July 10, 2009). Even the Tunney Act decisions acknowledge this rule.

[41] *See*, *e.g.*, United States v. Chevron U.S.A., Inc., 380 F. Supp. 2d, 1104, 1110 (N.D. Cal. 2003).

---

government.[42]  We do not ask this Court to review the facts and reasoning with regard to the FTC's determination that Google violated the Buzz decree, as we acknowledge that the FTC can easily prove a violation.  We ask only that this Court review the facts and reasoning behind the proposed remedy.  Finally, the Court's review of the FTC's reasoning and the facts supporting that reasoning must, at a very minimum, satisfy the Court that the proposed order "represents a reasonable factual and legal determination."[43]

We fully understand and acknowledge that the Court cannot insist on the ideal or even the best possible order, nor can the Court substitute its policy judgment for that of the Commission.  But it bears noting here that this amicus is not challenging the propriety of an FTC policy or even the implementation of an FTC policy.  Rather, in light of the FTC's stated intention in proposing the order before the Court, and in light of the purpose of the statute under which the government has chosen to file suit, Consumer Watchdog respectfully submits that on this record the proposed remedy is not "a reasonable factual and legal determination."

The FTC has stated that the proposed remedy is intended to make Google "abide by the underlying FTC [Buzz] consent order going forward."  And § 5(l) – the provision invoked by this proceeding – was added to the FTC Act in 1938 for the express purpose, according to the legislative history, of enforcing "obedience to the Commission's orders to cease and desist."  H. R. Rep. No. 75-1613 at 4 (1938).  The proposed remedy is neither "adequate" to effect the administrative (FTC) and legislative intention, nor does the proposed remedy satisfy the public interest in effecting the stated goals.  Three glaring deficiencies of the proposed order make it an unreasonable "factual and legal determination."

---

[42] Thus, in the Microsoft case, the government presented to the court the declaration of a Nobel Prize winning economist to support its reasoning.  *See* United States v. Microsoft Corp., 56 F.3d 1448, 1453-54, 1461 (D.C. Cir. 1995).  And in United States v. SBC Commc'ns, Inc. 489 F. Supp. 2d 1, 17 (D.D.C. 2007), the court required the government to submit materials consisting of basically its entire file, and the court reviewed these materials in order to determine whether the Tunney Act public interest requirement was satisfied.

[43] United States v. Oregon, 913 F.2d at 576-81 (9th Cir. 1990); United States v. Chevron U.S.A., 380 F. Supp. 2d 1104, 1111 (N.D. Cal. 2005).

**B. The Proposed Order Fails to Include a Permanent Injunction.**

"[T]he complaint serves as the yardstick by which to measure the fairness, reasonableness and adequacy of settlements," the FTC observed (citing both Second Circuit and Fifth Circuit authority) only recently in the *Circa Direct* briefing. March 14, 2012 FTC Submission at 3, 6. The complaint here states that this Court "is authorized to permanently enjoin the Defendant from violating the Google [Buzz] consent order," Safari Complaint at ¶ 62, and specifically seeks in its Prayer for Relief that this Court "[e]njoin Defendant from violating the Google [Buzz] Consent Order issued in Docket No. C-4336," Safari Complaint at ¶ 63(3).

The stipulated order proposed to this Court by the government appears clearly to contemplate the inclusion of this injunctive relief. The proposed order is captioned "[Proposed] Stipulated Order for Permanent Injunction and Civil Penalty Judgment" and recites in its second paragraph that the parties have consented to the entry of this "Stipulated Order for Permanent Injunction and Civil Penalty." Yet no permanent injunction appears in the proposed order. The closest provision to an injunction in the proposed order can be found in the "Remediation" section. That provision has nothing to do with enjoining further violations of the Buzz decree and, in any case, cannot be the "permanent" injunction referred to in the proposed order's caption because it is not "permanent" at all – rather, it obligates the defendant to engage in certain activity only until February 15, 2014.

So, using the complaint here "as the yardstick" to measure "adequacy," as the FTC acknowledges the precedents require, reveals a serious "disconnect." The government thought it needed a permanent injunction to ensure compliance with the Buzz order not only at the time the government drafted the complaint, but also at the time it drafted the proposed order for this Court's signature. Apparently, at some very late stage in the negotiating process, the FTC decided that it no longer needed a permanent injunction to ensure that Google "will abide by the underlying FTC consent order going forward."

The timing looks very suspicious, bringing to mind the Supreme Court's famous observation decades ago that the government "knuckled under" at the last minute and settled

1    antitrust litigation against a powerful defendant.  *See Cascade Natural Gas Corp. v. El Paso*

2    *Natural Gas Co.,* 386 U.S. 129, 141-42 (1967).  Here, in any case, it is apparent that the

3    government "relied heavily" on the defendant "in crafting the settlement," precisely the concern

4    evidenced by the *Chevron* court.  *See Chevron*, 380 F. Supp. 2d 1104, 1106.

5          Manifestly, this Court is owed the FTC's reasoning and the facts supporting that

6    reasoning to justify the last minute elimination of the injunction requested in the complaint – and

7    the government's explanation must be "reasonable."  We fully understand why Google would

8    balk at a permanent injunction.  Google has no more intention of complying with its privacy

9    undertakings in the future than it has in the past.  But why wouldn't the Commission insist upon

10   a permanent injunction if it believes "the most important question" is whether Google will abide

11   by the Buzz decree going forward?

12         We likewise understand that this is a settlement and we do not expect every minor relief

13   element in the complaint to be included in the proposed order.  For example, the complaint seeks

14   attorneys' fees, Safari Complaint ¶ 63(4), but that is not included in the proposed settlement.  By

15   contrast, the omission of a permanent injunction, particularly when contemplated by both the

16   complaint and the proposed order itself, is quite serious.

17         The statute under which the government seeks relief, § 5(l), empowers the court to order

18   a permanent injunction.  And a court injunction is the time-honored way the Commission ensures

19   compliance from a company that has repeatedly breached its undertakings with the Commission

20   in the past.  An injunction is the most important element of relief.  Thus, in *Circa Direct*, the

21   FTC led in its briefing with the proposed order's inclusion of "strong injunctive" relief to justify

22   its settlement, and spent pages of its briefing explaining how the agreed-to injunction goes

23   *beyond* the specific conduct alleged in the complaint, thus "fully vindica[ting] the FTC Act."

24   March 14, 2012 FTC Submission at 5, 8-9.

25         Without an injunction, the FTC has very little leverage to assure Google's future

26   compliance with the Buzz decree.  The next time Google violates the decree, the Commission,

27   under the proposed order, must start from scratch, without the benefit of a court ordered

28

injunction.  Google can (and likely will) deny liability yet again, putting the FTC to its proof in court, or, alternatively, negotiating some meaningless monetary penalty.  The failure to seek an injunction also limits the FTC's flexibility with regard to civil monetary penalties in the future, as we explain below.  Simply put, the absence of a permanent injunction gives Google little reason to take the Buzz decree seriously.

We do not suggest that this Court should automatically assume that the FTC could have secured an injunction if it had to litigate this case.  But, certainly, an objective analysis strongly suggests that it would have prevailed.  Both the FTC majority and Commissioner Rosch profess a "strong reason to believe that Google violated [the Buzz] order."  Google's public statements do not deny liability but rather suggest that the transgression was inadvertent.  *See infra* note 54.  Of course, Google has twice represented to the FTC and to the public that it had adopted a comprehensive privacy policy to prevent such incidents.  So, claims of inadvertence were not likely to be countenanced by this Court.  Most assuredly, the Commission's suggestion that "almost any penalty can be dismissed as insufficient" due to Google's size strongly supports the propriety of permanent injunctive relief.

**C.  The Proposed Order Fails to Include a Sufficient Civil Penalty.**

The absence of a permanent injunction puts enormous pressure on the size of the civil penalty to vindicate the legislative purpose of § 5(l) (to enforce "obedience" to the Commission's order) and to achieve the Commission's stated goal (assuring that Google will abide by the Buzz decree).  But compared to the defendant's revenues, profits and resources, the size of the penalty is less than paltry.  According to the numbers in the complaint, the penalty is less than one one-thousandth of Google's revenue from advertising fees, which do not even account for all of Google's gross revenues.  Safari Complaint at ¶ 14.

The Commission certainly knows how to set civil penalties in order to vindicate "the public interest by preventing future violations." March 14, 2012 FTC Submission at 15.  For example, in *Circa Direct*, the FTC required the defendants to surrender all their remaining assets.  *Id*. at 13.  And in the case the Commission says produced the largest fine to date for a violation

1   of a Commission consent order, the FTC required the defendants to turn over their homes, art

2   collections, guitar collections, wine collections, jewelry, cars, etc.[44]

3          Under the methodology described in the complaint (and statute) for calculating the size of

4   the civil penalty ($16,000 for each misrepresentation to the millions of Safari users), the

5   Commission could have sought a civil penalty far in excess of $22.5 million.[45]  Apparently, the

6   FTC negotiated the fine down from the statutory maximum, for unstated reasons.  The rationales

7   given in the FTC statement for the low number (the violation did not yield significant revenue

8   nor last for a long time) are inapposite.  Under the statute, the large number of affected users

9   makes the maximum penalty quite substantial regardless of its duration, and Google's profit from

10  its conduct is irrelevant to the calculation.

11         So, in the end, the Commission agreed to a penalty that even it conceded "can be

12  dismissed as insufficient."  The Commission has publicly offered three justifications for its

13  decision, none of which make the proposed order adequate, reasonable, or in the public interest.

14  First, in its official press release, the Commission chairman suggested that the size of the

15  proposed penalty will deter potential violators of FTC orders because they will realize that "they

16  will end up paying many times what it would have cost to comply in the first place."  The

17  reasoning is specious as applied to Google on the facts pled in this case.

18         It costs Google less to comply with the Buzz order than to violate it only if one limits the

19  cost calculation to Google's out-of-pocket compliance costs. Manifestly, the immediate, out-of-

20  pocket compliance cost to Google of abiding by the Buzz decree are minimal – a few new staff

21  positions, external audits, and the cost of time "lost" to employee compliance programs and

22  product reviews.  But these immediate out-of-pocket costs hardly constitute the real costs to

23  Google of complying with the Buzz decree.

24

25  [44] Press Statement, Federal Trade Commission, New Jersey-Based Telephone Fundraisers

26  Banned from Soliciting Donations; Will Pay $18.8 Million for Violating FTC Order (Mar. 31, 2010) http://www.ftc.gov/opa/2010/03/edg.shtm.

27  [45] *See* Complaint ¶¶ 58-61; United States v. Readers Digest Assn., 494 F. Supp. 770 (D. Del. 1980), aff'd 662 F.2d 995 (3d Cir. 1981).

28

Memo of P&A in Opp to Entry of Proposed Stipulated Order                    19
(Case No. CV-12-04177 SI)

As the complaint here states, Google makes tens of billions of dollars each year by tracking its users and selling targeted advertising.  Safari Complaint at ¶¶ 14, 23-26.  But, according to recent research by the Pew Research Center, a well-regarded, unbiased, not-for-profit research institution, the vast, overwhelming majority of search engine users do not want targeted advertising because they do not want their online behavior tracked and analyzed.[46]  Indeed, a sizeable majority of cell phone users have either uninstalled a cell phone application over concerns about having to share personal information or declined to install an application in the first place for similar reasons.[47]  The complaint itself acknowledges this same exact concern.  *See* Safari Complaint at ¶ 32 ("Google has acknowledged that some users would be wary of targeted advertising").

So, if users come to understand that Google is tracking their online behavior, they might well decrease use of Google's search service, costing the company a lot of money.  At a minimum, users would attempt to implement "opt-out" procedures if such were readily available and not overly complicated.

A rational, profit-maximizing company in Google's position wants to continue to track its users, and, hence, would logically obfuscate its privacy policy (if not intentionally misrepresent its policy to the extent it can get away with it legally) to lull users into inaction.  The proffered rationale for the FTC's meager penalty fails to account for the money a violator can make from its conduct and, conversely, fails to account for the money a violator stands to lose by being candid with its users and receptive to their concerns. If the Court is to accept the Commission's cost-benefit analysis as the justification for the deterrent effect of the proposed civil penalty, the cost-benefit analysis must at least be rational and include the true costs and benefits of non-compliance.

---

[46] Purcell, Brenner & Rainie, *Pew Search Engine Use 2012*, PEW INTERNET & AMERICAN LIFE PROJECT (Mar. 9, 2012), http://pewinternet.org/Reports/2012/Search-Engine-Use-2012.aspx.

[47] Boyles, Smith & Madden, *Pew Privacy and Data Management on Mobile Devices*, PEW INTERNET & AMERICAN LIFE PROJECT (Sept. 5, 2012), http://pewinternet.org/Reports/2012/Mobile-Privacy.aspx.

As a second proffered justification, the Director of the FTC's Bureau of Consumer Protection in a call with reporters deflected criticisms regarding the minuscule penalty by suggesting that the proposed order "sends a message" that "the Commission would insist on increasingly higher" civil penalties "if there's future violations."[48]  This is, at best, speculative and more likely misleading.  The composition of the FTC is changing with the announced appointment of a Google supporter to the Commission.[49]  Indeed, the chairmanship and majority of the Commission might change as a result of the November election.  There is simply no reason for Google or anyone else to believe that the Commission will insist that greater civil penalties be imposed on Google for future violations.

Moreover, the Commission lacks statutory authority willy-nilly to increase penalties for subsequent violations in the manner described by the Director.  The statute limits the amount a violator can be penalized – based upon the number of misrepresentations, the duration of the violation, the number of consumers affected, etc.  *See* 15 U.S.C. § 45(l).  The Commission is not seeking anywhere near the maximum allowable penalty for Google's current Safari violation, so if Google does exactly the same thing the next time it violates the Buzz order, the Commission would have room under the statutory maximum for seeking larger penalties.  But if Google violates the Buzz order in some new way (a far more likely scenario), then its conduct at the time will determine the size of the penalty under the statute.

Nor, of course, does the threat of the Commission seeking a larger fine mean that Google will pay it or even be deterred by the remote and speculative prospect of a larger Commission demand.  As we explain above, the penalty would have to be truly gargantuan to affect the cost-benefit analysis of a company in Google's position.  Of course, if the Commission secures a court injunction as part of the Safari settlement, then the Commission, at the next transgression, could avail itself of the Court's considerable powers to assess both "compensatory" and

[48] Jasmin Melvin, *Google pays $22.5 million to settle Apple Safari charges*, REUTERS (Aug. 9, 2012), http://www.reuters.com/article/2012/08/09/net-us-google-privacy-safari-idUSBRE8780VE20120809.

[49] Tony Romm and Elizabeth Wasserman, *FTC pick ripped Google probe*, POLITICO (Sept. 11, 2012), http://www.politico.com/news/stories/0912/81034.html.

1  "conditional" fines (not to mention prison time) in a civil contempt proceeding – and even

2  harsher penalties under a criminal contempt proceeding.  With an injunction in place, the

3  Commission staff might actually have a good faith basis for suggesting the possibility of

4  increasing monetary penalties at Google's next violation of the Buzz decree.[50]

5      Lastly, in response to criticism that the $22.5 million penalty constituted an ineffective

6  deterrent, the FTC staff (in its Facebook chat) claimed that the risk of bad publicity would deter

7  Google from future violations, even if the paltry fine did not.  "Deterrence is based on more than

8  money alone," stated the staff.  "Google is paying with black eyes as well as greenbacks."[51]  We

9  can scarcely imagine how a company that showed little shame at facilitating the illegal

10  importation of drugs[52] would be deterred at the prospect of bad publicity from violating an FTC

11  privacy order.  At bottom, then, the Commission offers no rational basis to permit this Court to

12  conclude that the size of its fine here or the prospect of future fines achieves either the purpose of

13  § 45(l) or the Commission's stated purpose in this case.

14  **D.  The Proposed Order Is Deficient in Including a Denial of Liability.**

15      Google's denial of liability, incorporated into the text of the proposed order, also

16  contravenes the public interest standard.  The FTC Rules of Practice, which govern

17  administrative settlements, permit and authorize what the FTC agreed to initially in the Buzz

18  settlement – a proviso in the settlement agreement that the agreement "does not constitute an

19  admission by any party that the law has been violated as alleged in the complaint."  *See* 16 C. F.

20

21  [50] In fact, in 2009 at the FTC's behest, a federal judge ordered a defendant to pay far more than
22  the proposed Safari penalty – $37 million – for violating a stipulated order.  *See* Press Statement,
    Federal Trade Commission, Judge Orders Kevin Trudeau to Pay More Than $37 Million for
    False Claims About Weight-Loss Book (Jan. 15, 2009),
23  http://www.ftc.gov/opa/2009/01/trudeau.shtm.  The Commission obtained the large penalty
24  because it had earlier secured an injunction under which it moved for contempt, an outcome
    foreclosed by the Commission's strategy here.

25  [51] Official Chat Transcript, Federal Trade Commission, *Google Q&A on Facebook Transcript*
26  (Aug. 9, 2012), http://www.ftc.gov/opa/socialmedia/facebookchats/120809googlefbchat.pdf.

27  [52] Thomas Catan, *Con Artist Starred in Sting That Cost Google Millions*, WALL STREET JOURNAL
    (Jan. 25, 2012),
28  http://online.wsj.com/article/SB10001424052970204624204577176964003660658.html.

R. § 2.32; Buzz Settlement at ¶ 5 of preamble.  But the FTC rules nowhere countenance what the Commission proposes to let Google do in this (Safari) case – expressly to "deny any and all liability for the claims set forth in the Complaint, and all material allegations of the Complaint, save for those regarding jurisdiction and venue" in the text of a court order settling civil litigation.

In *Circa Direct*, the proposed order contained a strong permanent injunction as well as what the court deemed a "significant" monetary penalty.  The proposed order did not contain an unequivocal denial of liability but only a statement declining to admit liability.  Yet the district judge approved the order only with substantial conditions.[53]  *Circa Direct* involved an agreement to settle a case brought initially in federal court for a violation of the FTC Act.  Here, the defendant is charged in federal court with violating an administrative order it had previously agreed to in an FTC administrative action – in other words, as Commissioner Rosch points out, contempt of an FTC order.  Commissioner Rosch called the Commission proposal to permit Google to deny liability "unprecedented" and "inexplicable."  The Commission points to but a single case in which it has done this before; we can find no others.

When questioned by the press, the FTC's Consumer Protection Bureau Director justified the inclusion of a denial of liability by claiming it had no bearing on the strength of the agreement.  "We don't get anything out of an admission [of liability] other than possibly a good headline," the Director stated.[54]  While the FTC might not get anything more than "a good headline" by, at the very minimum, conforming its conduct here to the spirit of its own rules, the public would benefit enormously if Google were required to admit liability in order to settle this case.  In fact, the Commission's failure to secure an admission of liability here has confused the public and risks damaging the public's interest.

---

[53] *See* FTC v. Circa Direct LLC, 2012 U.S. Dist. LEXIS 129090 at *21-25 (D.N.J. Sept. 11, 2012). Conditioning approval of a proposed government settlement on substantial changes in the settlement terms is a common court practice. *See*, e.g., United States v. Thomson Corp., 949 F. Supp. 907, 915-17 (D.D.C. 1996).

[54] Allison Grande, *FTC's $23M Google Fine Warns Cos. To Keep Privacy Promises*, LAW360 (Aug. 9, 2012), http://www.law360.com/articles/368371.print?section=technology.

1  Putting aside the larger question of whether consumers benefit from knowing the "truth"

2  of accusations in an FTC complaint – one of the issues in *Circa Direct* – consumers would

3  benefit substantially from knowing the truth of the accusations here regarding Google's fidelity

4  to its own privacy policy.  Indeed, consumers are not able to act in their stated interests in this

5  case unless they know the truth of the accusations.  As explained above, even the complaint here

6  acknowledges that many consumers do not wish to be tracked online.  And, when given the

7  opportunity, many consumers will take action to limit the personal information collected by

8  computer applications.  But they cannot take this action without accurate information.

9  Because the FTC permitted Google to deny the allegations of the FTC complaint, Google

10  put its own "spin" on the facts – both initially at the time of the *Wall Street Journal* story and

11  thereafter, when the settlement was announced.  Google's spin created considerable confusion in

12  the public over what the company actually did, who was at fault, whether the conduct really

13  violated the Buzz decree, and what the effect of the conduct was on consumers.[55]  As a

14  consequence, consumers lack important information they should have gotten from this case to

15  make informed choices regarding online conduct.  A decree that results in consumer confusion

16  and produces the strong possibility if not the likelihood of consumer injury cannot possibly meet

17  the public interest standard.

### III. Conclusion

19  As the court in *Circa Direct* observed, courts must review proposed settlements with

20  government agencies to ensure that courts "do not lend their prestige to decrees that disserve the

---

22  [55] *See*, e.g., *Google hit with record fine*, BIG BROTHER WATCH (Aug. 9, 2012),
http://www.bigbrotherwatch.org.uk/home/2012/08/google-hit-record-fine.html#.UFTXE9kZ_4I;

23  Kevin Hunt, *FTC Drops $22.5 Million Fine On Google, But Is It Really Apple's Fault?*,
HARTFORD COURANT (August 9, 2012), http://courantblogs.com/bottom-line/ftc-drops-22-5-

24  million-fine-on-google-but-is-it-really-apples-fault/; Thomas Claburn, *Google's Privacy
Invasion:  It's Your Fault*, INFORMATIONWEEK (Aug. 9, 2012),

25  http://www.informationweek.com/security/privacy/googles-privacy-invasion-its-your-
fault/232601119; Jonathan Mayer, *Setting the Record Straight on Google's Safari Tracking*, CIS

26  STANFORD LAW SCHOOL (February 21, 2012), http://cyberlaw.stanford.edu/blog/2012/02/setting-
record-straight-google%E2%80%99s-safari-tracking; Greg Sterling, *Cookiegate Another Privacy*

27  *Black Eye For Google*, SEARCH ENGINE LAND (Feb. 17, 2012),
http://searchengineland.com/cookiegate-another-privacy-black-eye-for-google-111993.

public interest and thereby afford false stature to the decree and risk damage to the court's own reputation."[56]  The order proposed here fails to satisfy the appropriate legal standards.  We ask the Court to deny the parties' motion to enter the order.


Dated:  September 21, 2012                    CARR & FERRELL *LLP*


                                        By:   /s/ Robert J. Yorio
                                              GARY L. REBACK, Of Counsel
                                              ROBERT J. YORIO

                                              Attorneys for *Amicus Curiae*
                                              Consumer Watchdog

---

[56] Circa Direct, 2012 U.S. Dist. LEXIS 129090 at *14 (Sept. 11, 2012).

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                        )
**FEDERAL TRADE COMMISSION**,           )
                                        )
    Plaintiff,         )
                                        )
    v.                 )
                                        )    Civil No. 11-CV-2172 RMB-AMD
**CIRCA DIRECT LLC**, and               )
**ANDREW DAVIDSON**,                    )
                                        )
    Defendants.        )
_____)


## <u>PLAINTIFF FEDERAL TRADE COMMISSION'S</u>
## <u>SUBMISSION SUPPORTING ENTRY OF PROPOSED STIPULATED</u>
## <u>FINAL JUDGMENT AND ORDER</u>

# TABLE OF CONTENTS

I. Introduction ................................................................................ 1

II. Standard of Review ...................................................................... 2

III. Applying the Standard to the Proposed Order ..................................... 5

  A. The Proposed Injunctive Relief Is Fair, Adequate, Reasonable, and in the Public Interest. ................................................................... 6

  B. The Proposed Monetary Provisions Are Fair, Adequate, and in the Public Interest. ....................................................................... 9

    1. The $11.5 million judgment is a reasonable approximation of Defendants' ill-gotten gains. ............................................... 10

    2. Defendants must surrender all their remaining assets..................... 13

    3. The monetary relief is a fair resolution serving the public interest. 14

    4. The proposed Order's lack of admissions is not relevant to Court's review. ........................................................................... 16

  C. Carving Out the Attorneys' Fees Dispute Does Not Affect the Proposed Order's Overall Fairness. .................................................. 17

IV. Conclusion ............................................................................... 20

<u>TABLE OF AUTHORITIES</u>

## Cases

*Binker v. Pennsylvania*, 977 F.2d 738 (3d Cir. 1992) ..................... 2, 5, 6, 15

*Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Human Res.*, 532 U.S. 598 (2001) ........................................... 19

*Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117 (D.C. Cir. 1983) ....... 2

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977) ........................... 3

*FTC v. Bronson Partners*, 654 F.3d 359 (2d Cir. 2011) ....................... 11, 13

*FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1 (1st Cir. 2010) ................. 11

*FTC v. Febre,* 128 F.3d 530 (7th Cir. 1997) ................................ 11

*FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192 (10th Cir. 2005) .............. 9

*FTC v. Gem Merch. Corp.*, 87 F.3d 466 (11th Cir. 1996)..................... 12, 14

*FTC v. H.N. Singer, Inc.*, 668 F.3d 1107 (9th Cir. 1982)............................ 14

*FTC v. Kuykendall*, 371 F.3d 745 (10th Cir. 2004)...................................... 11

*FTC v. Nat'l Urological Group, Inc.*, 645 F. Supp. 2d 1167 (N.D. Ga. 2008) ................................................................................................... 7

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994) ........................... 9, 15

*FTC v. QT, Inc.*, 448 F. Supp. 2d 908 (N.D. Ill. 2006), *aff'd*, 512 F.3d 858 (7th Cir. 2008) ................................................................................... 7

*FTC v. Ruberoid Co.*, 343 U.S. 470 (1952)...................................... 9

*Kirkland v. New York State Dep't of Corr. Servs.*, 711 F.2d 1117 (2d Cir. 1983)................................................................................................. 3

*Maher v. Gagne*, 448 U.S. 122 (1980) ....................................... 18

*Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 616 F.2d 1006 (7th Cir. 1980).................................................................................... 4

*Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672 (D.C. Cir. 1973) ....... 9

*Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615 (9th Cir. 1982)..... 5

*Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222 (3d Cir. 1990) ................................................................................................ 17

*SEC v. Citigroup Global Markets, Inc.*, No. 11 Civ. 7387, 2011 WL 5903733 (S.D.N.Y. Nov. 28, 2011), *stay granted pending hearing*, Nos. 11–5227, 11–5242, 2011 WL 6937373 (2d Cir. Dec. 27, 2011) ......... 3, 17

*Stearns & Foster Bedding Co. v. Franklin Holding Corp.*, 947 F. Supp. 790 (D.N.J. 1996) ............................................................................ 16

*Swift & Co. v. United States*, 276 U.S. 311 (1928) ....................................... 4

*United States v. Acton Corp.*, 733 F. Supp. 869 (D.N.J. 1990) ..................... 2

*United States v. Atofina Chems., Inc.*, No. 01-7087, 2002 WL 1832825 (E.D. Pa. Aug. 5, 2002) ....................................................................... 4

*United States v. Cannons Eng'g Corp.*, 899 F.2d 79 (1st Cir. 1990)... 2, 5, 15

*United States v. Kramer*, 19 F. Supp. 2d 273 (D.N.J. 1998) ......................... 2

*United States v. Microsoft Corp.*, 56 F.3d 1448 (D.C. Cir. 1995)................. 5

*United States v. Rohm & Haas Co.*, 721 F. Supp. 666 (D.N.J. 1989).... 2, 4, 5

*Wilkerson v. Martin Marietta Corp.*, 171 F.R.D. 273 (D. Colo. 1997).......... 5

## Statutes

15 U.S.C. § 45 ................................................................................ 6

15 U.S.C. § 52 ................................................................................ 6

15 U.S.C. § 55 ................................................................................ 7

## I.    Introduction

Plaintiff, Federal Trade Commission ("FTC" or "Commission"), submits this response to the Court's February 22, 2012 Order and Opinion ("Op.") to demonstrate that the proposed Stipulated Final Judgment and Order ("proposed Order") should be entered because it is fair, reasonable, adequate, and manifestly in the public interest.  The complaint in this case alleges that Circa Direct, LLC, and Andrew Davidson ("Defendants") deceptively advertised bogus weight-loss and other products using fake internet news sites.  The proposed Order contains strong injunctive relief and permanently enjoins Defendants from engaging in each of the deceptive practices alleged in the complaint.  The proposed Order also sets out strong monetary relief by ensuring that Defendants do not keep their ill-gotten gains.  Indeed, it requires Defendants to disgorge all of their significant assets, including Davidson's home, car, and retirement, checking, and investment accounts.  These assets are likely worth at least $2.5 million and will either be disgorged to the Treasury or, if possible, used to provide redress to consumers.  It is doubtful that stronger or more comprehensive relief could be obtained even if this case were tried to judgment.

1

## II. Standard of Review

A district court reviews a proposed consent decree to ensure it is fair, reasonable, adequate, and serves the public interest as articulated in the underlying statute. *See United States v. Acton Corp.*, 733 F. Supp. 869, 871 (D.N.J. 1990) (stating standard in CERCLA action); *United States v. Rohm & Haas Co.*, 721 F. Supp. 666, 680 (D.N.J. 1989) (same); *see also United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990) ("[r]easonableness, fairness, and fidelity to the statute" are the factors to be assessed in reviewing proposed consent decrees); *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983) (applying standard in Clean Air Act settlement); *United States v. Kramer*, 19 F. Supp. 2d 273, 281 (D.N.J. 1998) (consent decrees should be reviewed for fairness, reasonableness, and fidelity to the statute).  While these opinions, and indeed most decisions reviewing consent decrees, concern actions brought under statutes that specify a regulatory framework that guides the review of settlements, the Third Circuit recognizes that even in cases without such procedural requirements, courts still apply a "'universal' standard, that of fairness, adequacy and reasonableness." *Binker v. Pennsylvania*, 977 F.2d 738, 747-48 (3d Cir. 1992).

2

Courts have ample authority to enter a consent decree based on the allegations in the complaint and the relief sought by the plaintiff. As the Second Circuit put it, "the reasonableness and legality of the agreement under federal law must be measured against the allegations of the complaint and the relief which might have been granted had the case gone to trial." *Kirkland v. New York State Dep't of Corr. Servs.*, 711 F.2d 1117, 1132 (2d Cir. 1983) (internal citation omitted); *see also Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977). Thus, the complaint serves as the yardstick by which to measure the fairness, reasonableness, and adequacy of settlements.[1]

Courts assess the adequacy of consent decrees without requiring admissions, proof, or a determination that a violation has occurred. This rule is so universally followed that cases suggesting otherwise are exceedingly rare. We recognize that *SEC v. Citigroup Global Markets, Inc.*, No. 11 Civ. 7387, 2011 WL 5903733, at *2-4 (S.D.N.Y. Nov. 28, 2011), *stay granted pending hearing*, Nos. 11–5227, 11–5242, 2011 WL 6937373 (2d Cir. Dec. 27, 2011), could be read to require a court to find that a violation had occurred before approving a consent decree. But such a requirement would be contrary to well-settled law. More than eighty years ago, the Supreme

---

[1]     In cases such as this, where there has already been substantial factual development and significant judicial oversight, the court is of course free to review the record as well.

3

Court rejected precisely this argument, emphasizing that the contention that a consent decree "requires either admission or proof" of wrongdoing "ignores both the nature of injunctions . . . and the legal implications of a consent decree." *Swift & Co. v. United States*, 276 U.S. 311 (1928) (Brandeis, J.). Thus, courts reject the suggestion "that a finding of a constitutional or statutory violation [is] a necessary predicate to the entry of a consent decree." *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 616 F.2d 1006, 1015 (7th Cir. 1980) (citing *Swift*). Indeed, "[c]ompromise of litigation occurs precisely because there is uncertainty about the underlying factual circumstances and the range of possible recoveries." *Rohm & Haas*, 721 F. Supp. at 685-86.

Where, as here, the settlement results from a government enforcement action, the public interest is examined through the lens of the underlying statute; namely, does "the consent decree's substantive components serve the policies of the allegedly violated . . . statutes and the public interest." *United States v. Atofina Chems., Inc.*, No. 01-7087, 2002 WL 1832825, at * 5 (E.D. Pa. Aug. 5, 2002). And, in evaluating whether a proposed decree serves the policies of the underlying statute, courts give particular deference to the view of the public agency charged by Congress with the responsibility

4

of enforcing the statute. *See, e.g.*, *Wilkerson v. Martin Marietta Corp.*, 171 F.R.D. 273, 283 (D. Colo. 1997); *Rohm & Haas Co.*, 721 F. Supp. at 681.

In assessing whether the proposed settlement serves the public interest, the court's role is "not to determine whether the resulting array of rights and liabilities is the one that will best serve society, but only to confirm that the resulting settlement is within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1460 (D.C. Cir. 1995) (internal citations omitted).

In addition, a court must be alert to danger signals that a consent decree is not the product of an arm's length negotiation by the parties. A court should assess the overall contours of the settlement and how it was reached to gauge the "candor, openness, and bargaining balance" by which settlement was achieved. *See Cannons Eng'g*, 899 F.2d at 86. A settlement that appears to be the "'product of fraud or overreaching by, or collusion between, the negotiating parties'" should be rejected. *Binker*, 977 F.2d at 748 (quoting *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982)).

### III. Applying the Standard to the Proposed Order

The proposed Order amply satisfies all of the relevant factors. The settlement contains strong injunctive relief that addresses each of the

deceptive and illegal practices alleged in the complaint. The monetary relief requires Defendants to disgorge all of their assets, preventing further dissipation[2] while depriving them of their ill-gotten gains. Both the injunctive relief and the monetary relief in the proposed Order serve the public interest by furthering the purposes of the FTC Act.[3]

      A.    The Proposed Injunctive Relief Is Fair, Adequate, Reasonable, and in the Public Interest.

Analysis of the proposed injunctive relief begins with consideration of the Commission's complaint, filed on April 18, 2011, which charges Defendants with violating Sections 5 and 12 of the FTC Act[4] by marketing,

---

[2]     As discussed at note 12, *infra*, Defendants may spend up to $4,500 each month on actual, ordinary, and necessary business or personal expenses pursuant to the Preliminary Injunction. (PI § IV).

[3]     Because there is no suggestion the proposed Order is the product of fraud, overreaching by, or collusion between the parties, the concerns highlighted in *Binker*, 977 F.2d at 748, do not factor into this analysis. Defendants had legal representation from the outset of, and throughout, the litigation. (Prunty Decl. ¶¶ 5, 6, 8, 25.) The parties negotiated the proposed Order at arms-length, with an adversarial posture, and ultimately agreed on all issues except attorneys' fees, as discussed below. (*Id.*, ¶ 25.)

[4]     Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a) (2006). Section 12 of the FTC Act, 15 U.S.C. § 52, prohibits dissemination of any false advertisement in or affecting commerce for the purpose of inducing, or which is likely to induce, the purchase of food, drugs, devices, services, or cosmetics. "A violation of Section 12, the dissemination of false advertising, constitutes a violation of Section 5(a)." 15 U.S.C. § 52(b); *FTC*

6

*inter alia*, acai-berry weight-loss products, work-at-home programs, and surplus auction services, through websites designed to look like news reports.[5] (Compl. ¶ 9). To deceive consumers, Defendants' websites used domain names such as onlinenews6.com; displayed the logos of major television networks; purported to provide investigative news accounts by reporters who had investigated and tested a product and experienced dramatic results; and included comments purportedly provided by ordinary consumers extolling their success with the products. (Compl. ¶¶ 10-11). The complaint alleges that, in fact, almost everything about the news reports was fake: the pictured reporters, the news accounts, and the consumer accounts were all fictional. (Compl. ¶ 12). Defendants disseminated these websites for the sole purpose of promoting the featured products, which were sold on third-party merchant websites that consumers could access by

---

*v. Nat'l Urological Group, Inc.*, 645 F. Supp. 2d 1167, 1188 (N.D. Ga. 2008) (quoting *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 957 (N.D. Ill. 2006), *aff'd*, 512 F.3d 858 (7th Cir. 2008)). The acai berry-based products advertised by Defendants are either a "food" or "drug" as defined in Section 15(b) and (c) of the FTC Act. *See* 15 U.S.C. § 55(b)-(c).

[5] The FTC simultaneously sought a Temporary Restraining Order (TRO). Defendants retained counsel and stipulated to a TRO, which the Court entered on April 19, 2011. On June 1, 2011, the Court entered a stipulated Preliminary Injunction, which, like the TRO, as discussed herein, enjoined certain advertising practices, required a monthly accounting of expenditures and advertising, and also restricted Defendants' expenditures to preserve the amount available for disgorgement or redress.

clicking on a link on Defendants' websites.  (Compl. ¶ 13).  The complaint
also alleges that Defendants made false or unsubstantiated weight-loss
claims for acai berry weight-loss products on many of those fake news
websites.  (Compl. ¶¶ 19-21).

The complaint seeks entry of a "permanent injunction to prevent
future violations of the FTC Act by Defendants."  (Compl. Prayer for Relief
¶ B).  The proposed Order provides this relief.  If entered, it would enjoin
each Defendant permanently from engaging in any of the alleged violations
of the FTC Act set out in the complaint, *i.e.*, deceptive use of a fake news
format, failure to disclose Defendants' relationship to the seller, and false
and unsubstantiated weight-loss claims for acai-berry weight-loss products.
(*Compare* Compl. ¶¶ 17-27 *with* Prop. Order §§ I-VI).  It bears emphasis
that the injunctive provisions go beyond the specific conduct alleged here;
they also prohibit Defendants from making misleading and unsubstantiated
claims about the performance, efficacy, or benefits of any weight-loss
products, or about any other products, services, and programs that
Defendants may advertise in the future.  (Prop. Order §§ II-VI).

The proposed Order's injunctive provisions fully vindicate the FTC
Act.  The overriding purpose of the FTC Act is to protect consumers from
"deceptive acts and practices in or affecting commerce."  *See, e.g.*, *FTC v.*

8

*Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1202 (10th Cir. 2005) (FTC Act's primary purpose "is to lessen the rule of *caveat emptor*"); *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1099 (9th Cir. 1994) (Act's purpose is "to protect the consumer from being misled by governing the conditions under which goods and services are advertised and sold to individual purchasers") (quoting *Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 685 (D.C. Cir. 1973)). The proposed Order serves this purpose not only by specifically prohibiting the precise acts complained of, but also by prohibiting closely related deceptive advertising. *See FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952) ("If the Commission is to attain the objectives Congress envisioned, it cannot be required to confine its road block to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity."). To ensure Defendants abide by these mandates, the proposed Order allows the Commission to monitor compliance and provides for the retention of the Court's jurisdiction for enforcement purposes. (Prop. Ord. §§ IX-XIV).

      B.    <u>The Proposed Monetary Provisions Are Fair, Adequate, and in the Public Interest.</u>

Consideration of the proposed monetary relief also begins with the complaint, which alleges that Defendants caused consumer harm and

9

unjustly enriched themselves, (Compl. ¶ 28), and seeks monetary relief including redress for injured consumers and the disgorgement of ill-gotten monies. (Compl. Prayer for Relief ¶ C). The proposed monetary relief corresponds directly with the relief sought in the complaint by requiring Defendants to disgorge at least $2.5 million in ill-gotten gains while giving the Commission discretion to distribute that money to consumers if practicable.

### 1. The $11.5 million judgment is a reasonable approximation of Defendants' ill-gotten gains.

As alleged in the complaint, Defendants' fake news websites were designed to entice consumers to click on links that transferred them to a third-party merchant's website. (Compl. ¶ 13). Defendants received a commission from the merchant or, more commonly, from an intermediary company that worked with the merchant, for each product purchase or "free trial" sign-up their ads generated. (Compl. ¶ 13).

Discovery conducted in this case,[6] as well as accounting and financial statements Defendants produced pursuant to the TRO and Preliminary

---

[6] Counsel for the FTC has taken substantial discovery in this case, including issuing interrogatories and document requests to, and deposing, Defendants, as well as subpoenaing documents from thirteen companies with which Defendants conducted business, including a number of affiliate marketing companies. (Prunty Decl. ¶¶ 16, 18).

Injunction,[7] show that Defendants received at least $11.5 million from disseminating advertisements that employed the fake news format or contained the challenged weight-loss claims. (Prunty Decl. ¶¶ 17-19). The $11.5 million figure reflects gross revenue, not the amount Defendants cleared after paying advertising and other costs. (Prunty Decl. ¶ 19). Gross revenue or gross receipts is an appropriate measure for calculating disgorgement in cases under the FTC Act. *See FTC v. Bronson Partners*, 654 F.3d 359, 372-74 (2d Cir. 2011); *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 14-16 (1st Cir. 2010); *FTC v. Kuykendall*, 371 F.3d 745, 765-67 (10th Cir. 2004). This amount does not need to be determined with precision. Even at trial, all the Commission has to show is a reasonable approximation of such revenue. *FTC v. Febre,* 128 F.3d 530, 535 (7th Cir. 1997).

In many of the FTC's cases, the defendants sell directly to consumers. In those cases, it is easier to identify injured consumers and calculate the exact amount of consumer injury. Here, Defendants received commissions from third-party intermediaries for advertisements that led to sales of

---

[7]    Pursuant to the TRO and Preliminary Injunction entered in this case, Defendants have produced to the FTC an accounting of their revenues and expenses and sworn financial statements detailing their assets and liabilities. (Prunty Decl. ¶¶ 10, 11).

11

products sold by other merchants, and not from consumers. This makes it difficult to identify injured consumers,[8] and to approximate consumer loss, which likely reflects some multiple of the commissions paid to Defendants for each consumer sale (or sign-up for a "risk-free trial") linked to Defendants' advertising. Thus, consumer loss is likely several times Defendants' approximately $11.5 million in ill-gotten gains. (Prunty Decl. ¶ 23). The proposed Order gives the FTC the discretion to use recovered funds for consumer redress, or, if that proves impracticable, to deposit the funds with the Treasury as disgorgement. (Prop. Order § VII.H). Even if restitution proves impracticable, disgorgement of Defendants' "unjust enrichment" to the United States Treasury is an appropriate outcome because it deprives Defendants of their ill-gotten gains and sends a strong signal to potential scammers that they will not profit from taking advantage of consumers. *See FTC v. Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996) ("because it is not always possible to distribute the money to the victims of defendants' wrongdoing, a court may order the funds paid to the

---

[8] Neither Defendants, nor the companies with which Defendants directly did business, have the sales records necessary to identify consumers. (Prunty Decl. ¶¶ 20-22). However, the Commission is investigating how to identify consumers from certain merchants who likely advertised through Defendants. (Prunty Decl. ¶ 24).

United States Treasury"); *accord Bronson Partners*, 654 F.3d at 373 (an award of disgorgement, "strictly speaking . . . runs in favor of the Treasury, not the victims.").

### 2.    Defendants must surrender all their remaining assets.

Before the FTC would consider settlement, it required Defendants to prepare and sign under the penalty of perjury detailed financial statements. (Prunty Decl. ¶ 13).  These statements, combined with the FTC's review of bank statements and other documents,[9] show that Defendants retain significant assets.  These assets consist of cash and investments with an estimated value of $2.39 million and equity in a home and car purchased by Davidson.  (Prunty Decl. ¶ 14).  The proposed Order calls for the entry of an $11.5 million judgment, which reflects the FTC's calculation of Defendants' ill-gotten gains.  The proposed Order partially suspends the $11.5 million judgment, contingent upon Defendants not misrepresenting their financial condition and turning over all of their assets.  (Prop. Order § VIII).

The proposed Order gives Defendants 120 days from the order's entry to sell the house; if they are unable to do so within that time-frame, the house will be sold at auction and the proceeds will be turned over the

---

[9]    The FTC subpoenaed several financial institutions used by Defendants.  (Prunty Decl. ¶ 12).

13

Commission.  (Prop. Order § V.D).  The proposed Order requires Defendants to sell the car and turn over the proceeds to the Commission. Money contained in certain investment accounts must be turned over immediately to the Commission while other cash accounts (with an estimated total of $1.4 million) will be held in escrow by Defendants' counsel.  The escrow fund's purpose is to pay the mortgage, insurance premiums, and other reasonable and customary costs Defendants incur in the sale and maintenance of the house.[10]  Once Defendants sell the house, the balance of the funds in the escrow immediately transfer to the Commission. (Prop. Order § VII.B.4).

### 3.     The monetary relief is a fair resolution serving the public interest.

The monetary relief — taking all of Defendants' assets — serves the public interest by deterring others from violating the FTC Act and providing equitable relief in the form of disgorgement and restitution as "necessary to complete justice."  *FTC v. H.N. Singer, Inc.*, 668 F.3d 1107, 1112-13 (9th Cir. 1982); *see also Gem Merch.*, 87 F.3d at 469 (restitution and

---

[10]     The proposed Order also requires Commission or Court approval prior to the transfer of any funds from the escrow account (beyond mortgage and upkeep payments), and an accounting of all transactions for the account. (Prop. Order § VII.B.4).

disgorgement among relief courts can order); *Pantron I*, 33 F.3d at 1102 ("broad authority to fashion remedies appropriate for violations of the Act").

At trial, the Commission likely would seek a judgment that would exceed the amount Defendants will pay pursuant to this proposed Order. But such a victory might be pyrrhic.  Even if the Commission obtained such a judgment, the Commission could not expect to collect, in the near future, more than it will recover through the proposed Order.  To the contrary, by the time trial in this case would be completed, Defendants' assets would be depleted substantially by the expenses Defendants would incur for legal fees and living expenses.  By resolving the litigation through this settlement, Defendants avoid the risk of a much larger judgment (which may or may not ever be satisfied) while the Commission not only conserves resources but obtains immediate and certain relief.

For these reasons, the proposed Order reflects a balancing of the need to obtain specific monetary relief against individual defendants "while at the same time vindicating the public interest by preventing future" violations, *see Binker*, 977 F.2d at 746, as well as "concepts of corrective justice and accountability:  a party should bear the cost of harm for which it is legally responsible."  *See Cannons Eng'g*, 899 F.2d at 87.  The proposed Order properly takes into account both the extent of potential liability and the

15

ability of defendants to pay. *Stearns & Foster Bedding Co. v. Franklin Holding Corp.*, 947 F. Supp. 790, 813 (D.N.J. 1996) (finding settlement amount adequate where "defendants assert that the settlement amount . . . represents their entire assets and . . . [b]ased upon the record, there is no reason to doubt this assertion"). Because the proposed Order strips Defendants of ill-gotten gains and all of their available assets, this factor also supports the reasonableness and fairness of the proposed Order.

### 4. The proposed Order's lack of admissions is not relevant to Court's review.

As explained above, both binding Supreme Court precedent and nearly all lower court rulings have recognized that a consent decree need not be supported by the defendants' admission of the alleged facts. Accordingly, Defendants' acceptance of the proposed Order "without any admission or finding of liability," Op. at 2-3, poses no obstacle to the Court's approval of the decree. After all, although Defendants do not admit the facts alleged in the complaint, they have willingly forfeited their right to contest those facts for the purpose of this settlement. Moreover, there is no practical reason to believe that such an admission is necessary or would be beneficial.

16

First, Defendants' agreement, following arm's-length negotiations, to the stringent injunctive and financial terms contained in the proposed Order provides the Court with ample assurance that there is a substantial basis for the facts as alleged. Defendants' consent to such terms reflects their own understanding of a substantial risk of loss, were the case to be litigated.

Second, even if it were a relevant consideration,[11] an admission by Defendants likely would not benefit injured consumers. Violations of the FTC Act do not themselves support a private right of action. *See Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 231 (3d Cir. 1990). And even if Defendants' alleged misdeeds were actionable under other provisions of law, the financial terms of the proposed Order make it highly unlikely that consumers could reap significant benefits from any future judgment. Thus, the lack of admissions in the proposed Order should not be a consideration in its approval.

**C.    Carving Out the Attorneys' Fees Dispute Does Not Affect the Proposed Order's Overall Fairness.**

The proposed Order should be entered, notwithstanding the unresolved issue of attorneys' fees. As indicated in the motion filed March

---

[11]    *Citigroup Global Mkts., Inc.*, 2011 WL 5903733, at *4-6, suggests that it is "inherently dangerous" for courts to enter decrees without admissions, *id.* at *6, but as noted above, this view contravenes controlling law.

17

8, 2012, by Venable, LLC ("Venable"), defense counsel claim fees and costs in excess of $406,000.  Venable, having already received $150,000 from Defendants, seeks to obtain an additional $256,215.97 from Defendants' assets, which are subject to the proposed Order.  (Prunty Decl. ¶ 11).  The FTC soon will file an opposition to Venable's motion, explaining why the motion is meritless and should be denied.[12]

A consent decree is not insufficient simply because it does not resolve attorneys' fees.  Indeed, this often occurs in cases subject to statutes, such as 42 U.S.C. § 1988 (2006), that entitle the prevailing party to attorneys' fees.  In *Maher v. Gagne*, 448 U.S. 122, 126 (1980), and subsequent cases, the Supreme Court has recognized that in such disputes the court may first enter a consent decree that resolves the complaint and later adjudicate whether and to what extent the relief granted in the decree renders the plaintiff a "prevailing party" for purposes of attorneys' fees.  *See also Buckhannon Bd.*

---

[12]    Venable incurred these costs and fees during, and subject to, the Preliminary Injunction, which restricts Defendants' expenditures to actual, ordinary, and necessary business or personal expenses, including attorneys' fees and costs in this action.  (PI § IV).  As discussed in note 5, *supra*, the Preliminary Injunction requires Defendants to account for their expenses and to obtain written, prior approval from the FTC or the Court before encumbering or dissipating assets over a specified amount — $10,500 in the first month and $4,500 each month thereafter.  (PI § IV).  To date, neither the FTC nor the Court has authorized such expenditures for attorneys' fees. (Prunty Decl. ¶ 9).

*& Care Home, Inc. v. West Virginia Dep't of Health & Human Res.*, 532
U.S. 598, 605-06 (2001) (noting *Maher* with approval).[13]

Nor does the possibility of a subsequent award of attorneys' fees
undermine the proposed Order's overall fairness and reasonableness.  The
Order still serves the public interest by enjoining the alleged law violations
and ensuring that Defendants have been deprived of their remaining ill-
gotten gains.  To be sure, every dollar awarded to Venable is a dollar less
disgorged to the Treasury or available for consumer redress.  However, even
if the Court were to award the full amount sought by Venable – a position
the FTC strongly opposes – the funds available for disgorgement or
consumer redress still would exceed $2.2 million.  Moreover, continuing to
trial would inevitably entail even more defense costs, further depleting the
remaining funds.

---

[13]     *Maher*, by implication, also supports the proposition that district
courts do not need admissions to enter consent decrees, as the decree
explicitly stated that nothing therein was "'intended to constitute an
admission of fault by either party.'"  488 U.S. at 126 n.8 (quoting decree).

## IV.  Conclusion

The proposed Order not only provides individual accountability from the Defendants, who must turn over all of their assets and abide by the proposed Order's strictures, but also serves the broader interests of the FTC Act by protecting consumers from future harm and sending a powerful deterrent message to those inclined toward similar acts of deception.  At the same time, avoiding trial preserves scarce government and judicial resources.  For these and all the reasons outlined above, the FTC seeks entry of the proposed Order.


Respectfully submitted,


Paul J. Fishman
United States Attorney
Paul A. Blaine
Assistant United States Attorney
401 Market Street, 4th Floor
Camden, NJ 08101
Telephone: 856-757-5026
Facsimile:  856-757-5137


March 14, 2012

   /s/ Elizabeth Tucci
Laura M. Sullivan
Elizabeth Tucci
James A. Prunty
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Mail Drop NJ-3212
Washington, DC 20580
Telephone:  202-326-3327 (Sullivan)
202-326-2402 (Tucci)
Facsimile:  202-326-3259
lsullivan@ftc.gov; etucci@ftc.gov
jprunty@ftc.gov

Attorneys for Plaintiff

20

# CERTIFICATE OF SERVICE

I, Elizabeth Tucci, certify that on March 14, 2012, I served, via email (PDF attachment) and first-class mail as indicated below, copies of the foregoing Federal Trade Commission's Submission Supporting Entry of the Proposed Stipulated Order, and attached Declaration of James A. Prunty, on the following counsel for Defendants Andrew Davidson and Circa Direct, LLC:

Kristine Ann Sova (mail and email)
Venable LLP
1270 Avenue of the Americas
25th Floor
New York, NY 10020
kasova@venable.com

Edwin M. Larkin (*pro hac vice*) (email)
Venable LLP
emlarkin@venable.com

Lameke E. Cannon (*pro hac vice*) (email)
Venable LLP
lecannon@venable.com

/s/ Elizabeth Tucci
Elizabeth Tucci